# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 41 | **DATE** | 7/26/02 |
| **CASE TITLE** | Schnell vs. Applied Power | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the Court grants defendant's motion for summary judgment (35-1) as to Count 2,3,4,5 and 6, but denies the motion as to Count 1.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | number of notices | | **Document Number** |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | AUG 02 2002 | date docketed | | |
| | Docketing to mail notices. | | | | | 44 |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| OR | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 AUG -1 PM 6:43 Date/time received in central Clerk's Office | date mailed notice | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS\
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD E. SCHNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 01 C 41 |
| | ) | |
| APPLIED POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendant Applied Power, Inc. (API) has moved for entry of summary judgment in its

favor on the claims made by plaintiff Richard Schnell. For the reasons stated below, the Court

grants API summary judgment on Counts 2 through 6 but denies API's motion as to Count 1.

### Background

Schnell started his own business, Design Fluid Air Systems (DFAS) in 1980. In 1994,

DFAS began working on an order to produce a traveling die clamp for Ford Motor Company. In

the course of that project, Schnell approached Enerpac, a division of API, and asked Enerpac to

design a traveling die clamp for the Ford project. API ultimately acquired DFAS and hired

Schnell pursuant to an Employment and Non-competition Agreement dated October 26, 1995.

In July 1998, Enerpac decided to close down DFAS due to poor financial performance.

Schnell filed a state court lawsuit on November 27, 2000, which was subsequently removed to

this Court, alleging various breaches of the Employment Agreement.

## Discussion

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court views the evidence in the light most favorable to Schnell, the non-moving party, and draws reasonable inferences in Schnell's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). To avoid summary judgment, Schnell, who bears the burden of proof, "must affirmatively set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

## 1.   Accord and satisfaction / account stated (all Counts)

The Court rejects API's argument that Schnell's claims are barred by the doctrine of accord and satisfaction by virtue of his acceptance of his final checks. The three elements of an accord and satisfaction are "(1) an honest dispute between the parties as to the amount due at the time payment was tendered; (2) a tender of payment with the explicit understanding of both parties that it is in full payment of all demands; and (3) an acceptance by the creditor with the understanding that the tender is accepted as full payment." *Emrick v. First National Bank of Jonesboro*, 324 Ill. App. 3d 1109, 1116, 756 N.E.2d 914, 919 (2001). The doctrine of accord and satisfaction is grounded in contract law, so there must be consideration and a meeting of the minds with the intent to compromise. *Id.*

In this case, there was no meeting of the minds or intent to compromise. The first two checks issued by API contained accord and satisfaction language, which was also found in the accompanying cover letter, but Schnell expressly rejected those checks by returning them to API. API then issued two new checks without the restrictive endorsement and under separate cover, which Schnell cashed. This does not amount to an explicit understanding between the parties that the checks were accepted in full payment of all demands. *See Emrick*, 324 Ill. App. 3d at 1116, 756 N.E.2d at 919.

For the same reason, Schnell's acceptance of the two checks did not constitute an account stated, as API contends. An account stated is "an agreement between parties who have had previous transactions that the account representing those transactions is true and that the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 132 Ill. App. 3d 260, 267, 477 N.E.2d 513, 519-20 (1985). "The agreement must manifest the mutual assent of both the creditor and the debtor." *Id.* In this case, there was no meeting of the minds; Schnell did not agree that the two checks constituted full payment of all amounts due him because he refused to sign the checks with the restrictive endorsements. *See W.E. Erickson Construction*, 132 Ill. App. 3d at 267, 477 N.E.2d at 519-20.

## 2. Counts 1 and 2 (breach of bonus provision in Employment Agreement)

The Court rejects API's argument that it had no contractual obligation to award Schnell a bonus because the bonus was entirely discretionary on API's part. Under the Agreement, the only thing that was within API's sole discretion the establishment of the performance measures used to calculate the bonus :

3

> b. <u>Bonus</u>. The Employee shall be eligible for an annual bonus up
> to a maximum of $35,000 per year based on performance measures
> established by the Division's management in its sole discretion.

*Compare Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1239 (N.D. Ill. 1996), cited by API, where

the plaintiff had no contractual right to bonus commissions based on a policy which "reserved for

defendant the right and discretion to cancel the Plan at any time for any reason." API was

required to use good faith in establishing the performance measures for calculating Schnell's

bonus. *Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 765 N.E.2d 1079, 1090 (2002) ("there is a

'covenant of good faith and fair dealing' in every contract as a matter of law, absent an express

disavowal"). And once it established those measures, it gave up the discretion to decide whether

to award a bonus; if Schnell met the requirements API had established, he was contractually

entitled to the bonus.

1.     *Count 1* (Bonus for FY 1998)

For fiscal year 1998, API relied on the following criteria to determine Schnell's bonus:

(1) Schnell's individual performance; and (2) the financial performance of DFAS.

API awarded Schnell $3,675 of a possible $8,750 for his performance bonus. Schnell

says that in his termination meeting with Harm Nijzink and Sue Hrobar, Enerpac's vice president

of finance, Nijzink advised Schnell that he would get his bonus. Schnell has produced notes that

he says reflect what happened at the meeting. PX 81. API does not dispute that Nijzink told

Schnell he would get his bonus, but argues that any such statement was ineffectual without the

additional approval of Guus Boel, Nijzink's supervisor. Because this argument was made in

API's reply, Schnell has not had a chance to address it. The Court does not believe, however,

that the requirement of dual approval by itself is dispositive; we cannot say that it is beyond

dispute that Boel could have, in good faith, overruled Nijzink's alleged commitment to Schnell.

According to Schnell and his notes, Nijzink also conducted a performance review at the

termination meeting and gave him a 100% completed rating on the "Personal" portion of his

objectives. Schnell's written performance review for 1998, issued to him after his termination,

indicates that he fell short on all of his personal objectives. Schnell claims, however, that this

review does not reflect his earlier conversation with Nijzink.

Taken together, this evidence reflects a genuine factual dispute as to whether API

ultimately denied Schnell the remaining portion of his bonus in good faith. API objects to PX 81

as lacking in foundation. However, Schnell's own testimony supports the substance of the notes

and by itself is sufficient to require denial of summary judgment on Count 1, even if the notes

themselves have not yet been authenticated. In addition, "[a]n objection to lack of foundation is

formal, and evidence provided at the summary judgment stage need only be admissible in

content, not necessarily in form." *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 960

(N.D. Ill. 2001).

The other part of Schnell's bonus was to be based on DFAS's performance. There is a

genuine issue of fact as to whether DFAS suffered a loss of over $50,000 in FY 1998, which

would entitle Schnell to a bonus of $26,250. API claims DFAS showed a loss of $117,000.

Schnell claims DFAS showed a profit of $68,173.17, and DFAS's ledger dated 6/3/98 reflects

that fact. API argues that DFAS's ledger dated 5/6/98, just one month prior, shows a *loss* of

$180,178.95. This disparity between the two ledgers exists independent of Schnell's other

complained-of mischarges; i.e., $23,000 for training and $60,000 in inventory costs. API argues

that the ledgers are lacking in foundation, but absent further evidence regarding the source of *both* parties' figures, summary judgment is not appropriate on the issue of whether API breached the Employment Agreement or acted in bad faith when it failed to award Schnell any portion of his financial-based bonus.

2. *Count 2* (Bonus for FY 1997)

Schnell offers no evidence to support his claim that API breached the Employment Agreement when it determined that he had not met his financial objective for receiving a bonus for fiscal year 1997. First, he has not provided any evidence as to the criteria for awarding a bonus in 1997 (the objectives were apparently stated in a document entitled "Enerpac Executive Compensation Plan - Fiscal 97," but the document was not produced to the Court). Second, Schnell has not provided any evidence regarding DFAS's financial performance in FY 1997 or how such performance entitled him to a bonus that year.

Schnell appears to argue in his brief that DFAS's poor financial performance in FY 1997 was the result of API's decision to terminate the distribution portion of DFAS's business. He also claims that API orally promised to make some kind of an adjustment for DFAS due to the loss. Pl. Mem., p. 6. But as discussed in detail below with respect to Count 4, this alleged promise is too vague to support Schnell's claim for a bonus in 1997. There are no documents indicating how the alleged adjustment was to be made, or what API was going to do to offset the sales decrease. Nor can the Court discern whether the parties contemplated a one-time adjustment or a series of adjustments to offset future losses stemming from the shutdown of the distribution business. Moreover, there is no evidence that the supposedly promised adjustment would have been sufficient to entitle Schnell to a bonus for FY 1997. Schnell has not identified

how much profit or how little loss DFAS was required to achieve before he was entitled to a bonus, nor has he set forth the amount of the adjustment or how it would bring DFAS within the required figure. Finally, there is no evidence that API acted in bad faith in terminating the distribution business, and Schnell admits that as of April 30, 1997, DFAS had a loss of $393,000. Df. Facts ¶96. Schnell's claim for a bonus in 1997 is unsupported, and the Court therefore grants summary judgment in API's favor on Count 2.

3.      **Count 3 (breach of employment agreement - commissions on invoiced sales)**

Schnell's claim in Count 3 that API failed to give him credit for some Quick Die Change ("QDC") sales is not supported by any probative evidence. API allocated credit for sales as follows: (1) for dedicated customers, to the Line of Business ("LOB") that "owned" that customer; and (2) for shared customers, to the LOB that owned the particular part as determined by the part number. API explained this system to Schnell up front. Schnell provides no evidence that API did not follow this policy with all LOBs, or that API misapplied the policy with respect to DFAS. In sum, there is no evidence that API breached the Employment Agreement in calculating Schnell's sales commissions and the Court therefore grants summary judgment in API's favor on Count 3.

4.      **Count 4 (breach of employment agreement - commissions on representative sales)**

In Count 4, Schnell claims that API breached the Employment Agreement by failing to honor an oral promise to make an adjustment to DFAS's financial performance due to the elimination of DFAS's distribution business. Schnell supports this assertion with his own handwritten notes of a meeting with David Broadfoot (title unknown) of Enerpac and his typewritten memo to Scott Thompson dated 11/2/97 memorializing his conversation with

7

Broadfoot. Pl. Facts ¶87. No other documents or evidence exists regarding the claimed oral promise.

Schnell's testimony is sufficient to raise a question of fact as to whether Broadfoot promised to make an adjustment for DFAS after the distribution business was eliminated. However, based on the evidence provided by Schnell, the promise was not definite enough to create a contractual obligation on the part of API. Under Illinois law, "[a] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995) (quoting *Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 578 N.E.2d 981, 983 (1991)). It is not at all clear what kind of an "adjustment" API allegedly was going to make for DFAS. Schnell's memo states: "I was told that Enerpac would be fair and that the sales volume would be credited to me due to closing DFAS." At his deposition, Schnell explained that he and Broadfoot discussed the loss of income as a "recognized problem," and stated that "what Enerpac would be doing is offsetting the sales decrease and making sure that they were not asking me to do something that would hurt myself." Pl. Dep., p. 128. But there is no evidence indicating how the alleged adjustment was to be made, or what API was going to do to "offset" the sales decrease. Nor can the Court discern whether the parties contemplated a one-time adjustment or a series of adjustments to offset future losses stemming from the shutdown of the distribution business. "Without setting forth adequate terms for compliance, the [oral agreement] provides no basis for determining when breach has occurred, and, therefore, is not a valid and enforceable contract." *Academy Chicago Publishers*, 144 Ill.2d at 30, 578 N.E.2d at 984.

Finally, Schnell has not produced any evidence of bad faith on the part of API in selling off the distribution business. Absent additional evidence regarding API's alleged promise to adjust DFAS's account, we cannot find a genuine issue of material fact as to whether the promise was breached. The Court grants summary judgment in favor of API on Count 4.

5. **Count 5 (breach of employment agreement - termination)**

In his response to API's motion, Schnell limits Count 5 to a claim that he did not receive commissions on outstanding orders which API wrongfully turned back after closing DFAS. Schnell supports this claim with the following evidence:

(1) His own testimony that Sue Hrobar told him (at an unspecified date, time, and place) that they were turning back all the orders they could.

(2) Hearsay evidence that some unspecified representative of new employer, Ross Controls, informed him during an interview on an unspecified date that they "had received a phone call from Enerpac saying they . . . would be turning all of the orders back to them to fill with no commission to be paid to Enerpac."

(3) An Open Order Log (PX G), provided by Schnell without any explanation of who prepared it, when it was created and for whom, or how the data were compiled.

(4) Balance sheets from Milwaukee Cylinder, a customer of DFAS, showing sales levels for 1996 and 1997, from which, Schnell asserts, "it can be inferred there were open orders in 1998." Pl. Resp. to Df. Facts ¶112.

(5) A claim in his brief, without citation to the record, that Sue Hrobar and Peggy Lentz testified that orders were turned back. After searching the record on its own, the Court was not able to locate any such testimony. Hrobar stated that with

respect to DFAS inventory, "I would assume we would have returned that because that would have been returned." Hrobar Dep., p. 60. But that in no way suggests that API wrongfully canceled pending orders.

Without more, the evidence provided by Schnell is insufficient to establish that API breached the Employment Agreement with respect to the payment of commissions on outstanding sales orders to the date of his termination. Schnell has produced no evidence from which a fact finder could conclude that API canceled orders which did not require any further work by DFAS, or that it acted in bad faith by canceling orders which were not yet complete. The Court therefore grants summary judgment in API's favor on Count 5.

### 6. Count 6 (breach of employment agreement - termination)

In Count 6, Schnell claims that he had a right to continued employment through the expiration of the Employment Agreement on October 25, 2000. However, API properly notified Schnell of its intent to terminate the agreement, and paid him his salary in lieu of providing the 90 days notice required under the agreement. API also continued his medical and dental insurance coverage through the 90 day notice period. Because there is no evidence that Schnell was harmed by the technical breach of the notice provision, the Court grants summary judgment in API's favor on Count 6. *See Walker v. Ridgeview Construction Co.*, 316 Ill. App. 3d 592, 596, 736 N.E.2d 1184, 1187 (2000) ("[b]ecause Ridgeview failed to prove that it suffered damages, an essential element of a breach of contract action, Gateway was entitled to a directed finding as a matter of law").

## Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket item 35-1] as to Counts 2, 3, 4, 5, and 6, but denies the motion as to Count 1.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   July 26, 2002